Joyce W. Lindauer
State Bar No. 21555700
Lindauer & Vaughn
117 S. Dallas Street
Ennis, Texas 75119
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Proposed Attorney for Debtor/Plaintiff

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **LOUIS INVESTMENTS, LLC,** | § | **CASE NO. 26-33110** |
| | § | |
| **Debtor.** | § | **CHAPTER 11** |
| | § | |
| | § | |
| **LOUIS INVESTMENTS, LLC; REMINGTON RANCH'S BEST LIVING, LLC; A-V 23 EAST OWNER, LLC; BARCELONA BEST LIVING LLC; BRYAN HILL'S BEST LIVING LLC; TRDWIND CAPITOL, LLC; A-V CLASSEN OWNER LLC; COPPERFIELD APARTMENTS LIMITED PARTNERSHIP; LAKESIDE BEST LIVING LLC; BARTLESVILLE BEST LIVING, LLC; LOFTS AT NORTH PENN BEST LIVING LLC; MONTGOMERY BEST LIVING LLC; MUNTAGE BEST LIVING LLC; ONE ETON SQUARE LLC; ONE ETON TIC 1, LLC; RIDGE BEST LIVING LLC; RIVERPARK BEST LIVING LLC; SHORELINE'S BEST LIVING LLC; SPRINGDALE VILLAGE'S BEST LIVING, LLC; SUMMER OAKS BEST LIVING, LLC;; A-V VILLAGE CREEK OWNER LLC; VILLAS AT MIDTOWN BEST LIVING LLC; WOODLAND MANOR'S BEST LIVING LLC; WOODLAND MANOR TIC 1, LLC; B & J WOODSCAPE/OKLAHOMA CITY LLC; EATON BEST LIVING, LLC; EATON PLACE TIC 1, LLC; 727 LOFTS** | § | **ADVERSARY PROCEEDING**<br><br>**CASE NO. _______________** |

| | |
|---|---|
| **BEST LIVING, LLC; 727 LOFTS HOLDINGS, LLC; VESTA – SEMINOLE RIDGE, LLC; TUSCANY VILLAGE BEST LIVING, LLC; PUTNAM GREEN TIC INTEREST, LLC; AUERBACH-VESTA LLC; DREXEL FLATS ACQUISITION LLC; AND DREXEL FLATS ACQUISITION TIC LLC,** | § § § § § § § § |
| | § |
| **Plaintiffs,** | § |
| **v.** | § |
| | § |
| **YSA Investments 1, LLC,** | § |
| | § |
| **Defendant.** | § |
| | § |

**COMPLAINT TO AVOID TRANSFERS AND RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTY COURT:

COME NOW, Plaintiffs Louis Investments, LLC ("Louis Investments"); Remington Ranch's Best Living, LLC; A-V 23 East Owner, LLC; Barcelona Best Living LLC; Bryan Hill's Best Living LLC; TRDwind Capitol, LLC; A-V Classen Owner LLC; Copperfield Apartments Limited Partnership; Lakeside Best Living LLC; Bartlesville Best Living, LLC; Lofts at North Penn Best Living LLC; Montgomery Best Living LLC; Muntage Best Living LLC; One Eton Square LLC; One Eton TIC 1, LLC; Ridge Best Living LLC; Riverpark Best Living LLC; Shoreline's Best Living LLC; Springdale Village's Best Living, LLC; Summer Oaks Best Living, LLC; A-V Village Creek Owner LLC; Villas at Midtown Best Living LLC; Woodland Manor's Best Living LLC; Woodland Manor TIC 1, LLC; B & J WoodScape/Oklahoma City LLC; Eaton Best Living, LLC; Eaton Place TIC 1, LLC; 727 Lofts Best Living, LLC; 727 Lofts Holdings, LLC, Vesta – Seminole Ridge, LLC; Tuscany Village Best Living, LLC; Putnam Green TIC Interest, LLC; Auerbach-Vesta LLC; Drexel Flats Acquisition LLC; and Drexel Flats Acquisition TIC LLC (collectively, but excluding 727 Lofts Holdings, LLC, the "Title Owners Plaintiffs", and together with Louis Investments, the "Plaintiffs"), by and through their undersigned counsel, and

file this Complaint against Defendant YSA Investments 1, LLC ("Defendant" or "YSA"), and allege as follows:

## PRELIMINARY STATEMENT

1. This case is about reversing an old-fashioned bust-out orchestrated by a convicted felon, Efraim Diveroli, who owns and controls YSA.

2. YSA advanced short-term money at rates that began as extraordinary, grew prodigiously, and culminated in a $317,000 cash out loan that generated more than $919 million in interest in approximately 43 days. The loan documents pledged membership interests—not real property—in certain holding companies. None of the pledgors—and certainly none of the Title Owner Plaintiffs, who were not parties to the loan documents—executed mortgage grants in favor of YSA.

3. YSA tried to turn its unconscionable claim into real-world control. Even though YSA had no such rights, YSA nonetheless signed and recorded second mortgages against at least twenty-five multifamily properties in Oklahoma, Arkansas, and Kansas. After recording those second mortgages, YSA went further: YSA attempted to deliver, execute, record, enforce, or otherwise use deeds in lieu of foreclosure purporting to act on behalf of the Title Owner Plaintiffs and purporting to transfer the properties to YSA or for YSA's benefit, based solely on YSA's signatures on both sides of the transaction. The transfers of title were without any valid authority, for no value, and without consent of the Title Owner Plaintiffs. YSA then escalated from title-clouding to physical self-help. On July 20, 2026, acting without stay relief, without eviction process, and without any court order authorizing possession, YSA violated the automatic stay and state law by forcibly entering and taking steps to expel Title Owner Plaintiffs, including debtor Plaintiffs, from possession and operational control of properties by using threats of arrest, lock changes, and imposition of competing management personnel.

4. YSA excused its actions based upon a one-paragraph Joinder of Borrower-Affiliated Entities ("Joinder") and a Power of Attorney clause ("POA") in the loan documents. None of the Title Owner Plaintiffs signed any of those loan documents. None of the Title Owner

Plaintiffs authorized or consented to YSA exercising self-help to try and wrest ownership and control of the properties from the Title Owner Plaintiffs.

5. The Joinder does not identify any properties, grant mortgages, list Title Owner Plaintiffs, include legal descriptions, or mention real property. The POA does not identify any properties, grant new collateral, authorize portfolio-wide mortgage creation, authorize any deeds in lieu of foreclosure, authorize any conveyance of title to YSA, authorize YSA to act as both purported transferor and transferee, waive foreclosure requirements, waive estate or title-owner rights, convey fee title, or supply authority for any self-dealing deed transaction.

6. The goal of this adversary proceeding is to reverse YSA's literal land grab of hundreds of millions of dollars in real property for no reasonably equivalent value.

7. Indeed, the nominal value of net principal advanced to entities that are not Title Holders does not support the exponentially larger obligations YSA claims it is due, nor does it support the Joinder, POAs, second mortgages, deeds-in-lieu instruments or attempted deeds-in-lieu transfers, and title-clouding conduct YSA has exploited.

8. Previously, the Delaware Court of Chancery denied mandatory injunctive relief under a heightened "clearly established" standard with respect to releasing the second mortgages, and ruled on Delaware contract and usury-defense issues. The parties in that case, who are not the plaintiffs here, have requested that the appellate court agree to hear the interlocutory appeal of the Court's decision. In any event, this Complaint is not an appeal from that order. The Delaware Court did not decide the avoidance action questions presented here, and the appropriate place to decide them is within this jurisdiction.

9. Plaintiffs seek avoidance, recovery, preservation, disallowance, reduction, estimation, subordination, turnover, injunctive relief, and declaratory relief under 11 U.S.C. §§ 105, 362, 502, 506, 510(c), 542, 544, 547, 548, 550, and 551, as well as conversion and unjust enrichment/restitution claims. Plaintiffs also seek damages for YSA's multiple postpetition violations of the automatic stay, including a declaration that YSA's postpetition actions against Entrata, Inc. and/or its affiliates, and the Debtor Plaintiffs were void or voidable, compensatory

sanctions, attorneys' fees, costs, and such coercive and remedial relief as is necessary to restore the estates to the position they would have occupied absent YSA's stay violation.

## JURISDICTION AND VENUE

10. Louis Investments, LLC, Remington Ranch's Best Living, LLC, Barcelona Best Living, LLC, Lofts at North Penn Best Living, LLC, Ridge Best Living, LLC, A-V Village Creek Owner LLC, Woodland Manor's Best Living, LLC, Woodland Manor TIC 1, LLC, 727 Lofts Best Living, LLC, and 727 Lofts Holdings, LLC are each chapter 11 debtors in respective bankruptcy proceedings before this Court (collectively, the "Debtor Plaintiffs", with the remaining Plaintiffs hereinafter referred as the "Non-Debtor Plaintiffs." The Non-Debtor Plaintiffs are expected to file chapter 11 during the pendency of this action, which at such point, each Non-Debtor Plaintiff shall become a Debtor Plaintiff, as applicable).

11. This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This adversary proceeding includes claims that arise under title 11, arise in cases under title 11, and are related to cases under title 11 within the meaning of 28 U.S.C. § 1334(b).

12. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (G) (H), (K), and (O).

13. To the extent any claim asserted by any Non-Debtor Plaintiff is determined to be non-core, this Court has "related to" jurisdiction under 28 U.S.C. § 1334(b) because the outcome of those claims will affect the administration of the pending chapter 11 estates of the Debtor Plaintiffs, the value of estate property, the scope and priority of YSA's claims, the validity and enforceability of alleged liens, deeds, deeds in lieu of foreclosure, powers of attorney, possession and management rights, the debtors' restructuring efforts, and the estates' relationships with tenants, managers, vendors, lenders, and counterparties.

14. Jurisdiction also exists over the Non-Debtor Plaintiffs' claims because those claims are factually and legally intertwined with the claims of the Debtor Plaintiffs and with disputes over estate property, property under the management of Debtor Plaintiff Louis Investments, claim allowance, lien validity, turnover, avoidance, possession, control, and management rights.

Resolution of the Non-Debtor Plaintiffs' claims will affect, among other things, the estates' rights to preserve going-concern value, maintain operational control, protect records and revenue streams, prevent further self-help takings, determine the scope of YSA's alleged secured and ownership rights, and formulate and implement chapter 11 strategy.

15. Louis Investments' role as the upstream manager gives it rights, powers, duties, claims, defenses, and economic and operational interests connected to the Title Owner Plaintiffs' properties. Those interests include, without limitation, direct or indirect management rights, governance rights, control rights, contract rights, rights to direct or preserve management, records and information rights, causes of action, defenses, claims to protect the property structure, claims to prevent unauthorized transfers or control changes, and reorganization value. These legal and equitable interests are property of Louis Investments' bankruptcy estate under 11 U.S.C. § 541. Because the Non-Debtor Plaintiffs' claims directly affect those estate interests, those claims are at minimum related to the Louis Investments chapter 11 case and to the other pending Debtor Plaintiff cases The same is true for any pending Debtor Plaintiff case in which YSA's alleged mortgages, deeds in lieu of foreclosure, title-transfer theories, possession theories, management-control theories, or self-help takeover conduct affects estate property, property under the management of Debtor Plaintiff Louis Investments, or estate-related rights.

16. Additionally, one or more of the Non-Debtor Plaintiffs are expected to file chapter 11 cases. Those anticipated filings provide an additional basis for this Court to exercise jurisdiction over the claims affecting those entities and their properties, because the same disputed liens, deeds, deeds in lieu of foreclosure, title claims, possession claims, management-control claims, and self-help acts that are at issue here are expected to become property-of-the-estate, automatic-stay, claim-allowance, and reorganization issues in those cases as well.

17. The Court also has jurisdiction to enter orders necessary or appropriate to enforce the automatic stay, preserve estate property, determine the validity, extent, priority, and enforceability of asserted liens and title-transfer instruments affecting estate interests, compel turnover, and prevent piecemeal interference with the chapter 11 estates and estate-related rights.

18. Venue is proper under 28 U.S.C. §§ 1408 and 1409 because the Louis Investments chapter 11 case and the other Debtor Plaintiffs chapter 11 cases are pending in this District and because this adversary proceeding arises in, arises under, and is related to these cases.

19. Plaintiffs consent to entry of final orders and judgment by this Court on all core matters. To the extent any matter is non-core, Plaintiffs request proposed findings and conclusions unless all parties consent to final adjudication by this Court. To the extent the Non-Debtor Plaintiffs assert non-core but related-to claims, those claims are properly before this Court under 28 U.S.C. § 1334(b), and Plaintiffs request that this Court hear those claims together with the core matters because severing them would risk inconsistent rulings, duplication of effort, and disruption of estate administration.

## PARTIES

20. Plaintiff Louis Investments is a Kansas limited liability company. Louis Investments is the upstream manager entity for the Title Owner Plaintiffs and related property-owning structures.

21. Plaintiff Remington Ranch's Best Living, LLC is the title-owning entity for the multi-family property located at 1815 N Boomer Road, Stillwater, OK 74075, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

22. Plaintiff A-V 23 East Owner, LLC is the title-owning entity for the multi-family property located at 11321 E 23rd St Unit 1, Tulsa, OK 74129, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

23. Plaintiff Barcelona Best Living LLC is the title-owning entity for the multi-family property located at 5160 S Yale Ave, Tulsa, OK 74135, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver,

execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

24. Plaintiff Bryan Hill's Best Living LLC is the title-owning entity for the multi-family property located at 7204 NW 36th St, Bethany, OK 73008, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

25. Plaintiff TRDwind Capitol, LLC is a Texas limited liability company and the title owning entity for the multi-family property located at 215 NE 28th St, Oklahoma City, OK 73105, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

26. Plaintiff A-V Classen Owner LLC is the title-owning entity for the multi-family property located at 2200 N Classen Blvd, Oklahoma City, OK 73106, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

27. Plaintiff Copperfield Apartments Limited Partnership is the title-owning entity for the multi-family property located at 2400 NW 30th St, Oklahoma City, OK 73112, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

28. Plaintiff Lakeside Best Living LLC is the title-owning entity for the multi-family property located at 2186 S 99th E Ave, Tulsa, OK 74129, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver,

execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

29. Plaintiff Bartlesville Best Living, LLC is the title-owning entity for the multi-family property located at 5530 Colony Way, Bartlesville, OK 74006, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

30. Plaintiff Lofts at North Penn Best Living LLC is the title-owning entity for the multi-family property located at 15501 N Pennsylvania Ave, Edmond, OK 73013, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

31. Plaintiff Montgomery Best Living LLC is the title-owning entity for the multi-family property located at 500 W Main Street, Oklahoma City, OK 73102, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

32. Plaintiff Muntage Best Living LLC is the title-owning entity for the multi-family property located at 3041 NW 41st St, Oklahoma City, OK 73112, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

33. Plaintiff One Eton Square LLC and Plaintiff One Eton TIC 1, LLC are the title-owning entities for the multi-family property located at 8111 E 60th St, Tulsa, OK 74145, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of

foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

34. Plaintiff Ridge Best Living LLC is the title-owning entity for the multi-family property located at 3834 N Oak Grove Dr, Midwest City, OK 73110, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

35. Plaintiff Riverpark Best Living LLC is the title-owning entity for the multi-family property located at 7803 S Wheeling Ave, Tulsa, OK 74136, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

36. Plaintiff Shoreline's Best Living LLC is the title-owning entity for the multi-family property located at 9601 East 21st Place, Tulsa, OK 74129, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

37. Plaintiff Springdale Village's Best Living, LLC is the title-owning entity for the multi-family property located at 4330 S Barnes Ave, Oklahoma City, OK 73119, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

38. Plaintiff Summer Oaks Best Living, LLC is the title-owning entity for the multi-family property located at 5744 NW 16th St, Oklahoma City, OK 73127, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

39. Plaintiff A-V Village Creek Owner LLC is the title-owning entity for the multi-family property located at 6630 S Zunis Ave, Tulsa, OK 74136, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

40. Plaintiff Villas at Midtown Best Living LLC is the title-owning entity for the multi-family property located at 2001 E Skelly Dr, Tulsa, OK 74105, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

41. Plaintiff Woodland Manor's Best Living LLC and Plaintiff Woodland Manor TIC 1, LLC are the title-owning entities for the multi-family property located at 8641 E 61st St, Tulsa, OK 74133, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

42. Plaintiff B & J WoodScape/Oklahoma City LLC is the title-owning entity for the multi-family property located at 4200 N Meridian Ave, Oklahoma City, OK 73112, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

43. Plaintiffs Eaton Best Living, LLC and Plaintiff Eaton Place TIC 1, LLC are the title-owning entities for the multi-family property located at 517 E Douglas Ave, Wichita, KS 67202, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

44. Plaintiff 727 Lofts Best Living, LLC is the title-owning entity for the multi-family property located at 727 E Main Pl Jenks, OK 74037, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit. Plaintiff 727 Lofts Holdings, LLC is the member of 727 Lofts Best Living, LLC whose rights are impaired by the conduct of YSA set forth in this Complaint.

45. Plaintiff Vesta – Seminole Ridge, LLC is the title-owning entity for the multi-family property located at 125 W I-240 Service Road Oklahoma City, OK 73139, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

46. Plaintiff Tuscany Village Best Living, LLC is the title-owning entity for the multi-family property located at 6900 London Way, Oklahoma City, OK 73132, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

47. Plaintiff Putnam Green TIC Interest, LLC and Plaintiff Auerbach-Vesta LLC are the title-owning entities for the multi-family property located at 7525 Knight Lake Drive Oklahoma City, OK 73132, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

48. Plaintiff Drexel Flats Acquisition LLC and Plaintiff Drexel Flats Acquisition TIC LLC are the title-owning entities for the multi-family property located at 8800 South Drexel Avenue, Oklahoma City, OK 73159, against which YSA recorded or asserted a second mortgage, and, on information and belief, as to which YSA later attempted to deliver, execute, record,

enforce, or otherwise use a deed in lieu of foreclosure or similar title-transfer instrument purporting to convey property to YSA or for YSA's benefit.

49. Defendant YSA is a Delaware limited liability company and hard-money lender based in Miami, Florida. YSA is owned and controlled by felon Diveroli, whose story as an arms dealer was portrayed by Jonah Hill in the 2016 movie War Dogs.

50. YSA has asserted claims against Plaintiffs and has asserted interests in properties owned by the Title Owner Plaintiffs and managed or controlled through the Louis Investments/Vesta upstream structure. YSA has also attempted to act as attorney-in-fact, agent, transferor, transferee, beneficiary, and recipient in connection with deeds in lieu of foreclosure and other title-transfer instruments affecting the properties owned by the Title Owner Plaintiffs.

## FACTUAL ALLEGATIONS

### A. The Louis Investments/Vesta Enterprise and Property Structure

51. Plaintiff Louis Investments is the direct or indirect manager of all of the Title Owner Plaintiffs, and manages a portfolio of multifamily real estate assets through a network of limited liability companies.

52. The Title Owner Plaintiffs own the actual real estate that is the target of Diveroli's bust-out.

53. The Title Owner Plaintiffs are the entities whose property YSA encumbered with second mortgages. YSA recorded instruments directly against property owned by these Plaintiffs and impaired upstream membership interests. YSA also delivered, executed, recorded, enforced, or otherwise used a deed in lieu of foreclosure or similar instrument purporting to convey or transfer property owned by one or more Title Owner Plaintiffs to YSA or for YSA's benefit. The original source of funds for investments in these properties is various private investors and investment groups. If YSA is permitted to take these properties, those legitimate investments will be wrongfully extinguished.

54. The distinction between membership interests and real property is central. A membership interest is not the real estate. A pledge of a membership interest is not a mortgage. A

power of attorney under a pledge agreement is not a blank mortgage on every asset in a corporate family. Nor is it a blank deed, deed in lieu of foreclosure, conveyance instrument, foreclosure deed, or title-transfer authority allowing YSA to convey the Title Owner Plaintiffs' real property to itself. These distinctions are even more important here when the collateral were fractional membership interests in these entities.

55. The second mortgages injured the Title Owner Plaintiffs directly because the mortgages clouded title to their properties, impaired alienability, blocked or threatened transactions, threatened senior-loan defaults, and damaged property value. Any deed in lieu of foreclosure or attempted deed-in-lieu transaction injured the Title Owner Plaintiffs even more directly by purporting to transfer, surrender, impair, cloud, or place at risk fee title to their real property without valid authority, without new value, without foreclosure process, and without consent of the Title Owner Plaintiffs.

56. The second mortgages also injured Louis Investments because they impaired the property structure Louis Investments manages, interfered with Louis Investments' management authority, jeopardized value under Louis-managed structures, and disrupted Louis Investments' ability to stabilize, refinance, sell, or reorganize the properties. Any deed in lieu of foreclosure likewise impaired Louis Investments' management structure and reorganization efforts by attempting to remove, surrender, transfer, or place under YSA's control property central to the Louis/Vesta enterprise and its restructuring.

**B. The Loan Transactions**

***i. The First Six Loan Transactions***

57. Marc Kulick, Louis Investment's manager, was introduced to Efraim Diveroli, principal of YSA, in April 2024 as part of Mr. Kulick's efforts to obtain short-term financing for Asset Holder, LLC ("Asset Holder"), an affiliate of various entities owned or managed by Mr. Kulick known as Vesta Realty, LLC.

58. On October 8, 2024, after several months of intermittent negotiations, the parties entered into their first transaction, a short-term loan of $775,000 at 7% monthly interest (85%

annual interest) (the "October 2024 Loan"). Asset Holder was the borrower under the October 8 Loan, Vesta Holdings, LLC ("Vesta Holdings") the pledgor, and YSA the lender. The October 2024 Loan was documented by a Promissory Note, Collateral Pledge and Security Agreement ("CPSA"), and a Personal Guaranty and Right of First Offer (the "Guaranty" and collectively, the "Loan Documents"). Asset Holder and Vesta Holdings are fractional owners of certain of the Title Owner Plaintiffs. None of the Title Owner Plaintiffs are borrowers, pledgors, or guarantors under the October 2024 Loan.

59. The collateral for this first loan, set forth in the CSPA (the "October 2024 CSPA"), was allegedly (i) Vesta Holdings' already encumbered fractional membership interests in thirteen Delaware LLCs; (2) Asset Holder's unencumbered membership interests in four other Delaware LLCs; and (3) the rights inhering in those two sets of interests, such as the rights to distributions as a member and other rights given to a member under the various LLCs' organizational documents.

60. This collateral was used for and identically described in all subsequent loan transactions between the parties except one (the April 2025 loan transaction described below). Vesta Holdings repaid the October 2024 loan.

61. Over the next several months (January 22, 2025; January 24, 2025; January 30, 2025; February 4, 2025; and February 10, 2025), Asset Holder, Vesta Holdings and YSA entered into five more short-term loan transactions, using the same form of documents as the October 2024 Loan, including the same listed collateral, for similar amounts and at similar interest rates. Vesta Holdings paid off each of these loans.

***ii. The February 2025 Loan Transaction***

62. On February 18, 2025, the parties entered into a seventh loan transaction, using loan documents essentially identical to those used in the prior six loans (the "February 2025 Loan"). This short term loan was for $1,500,000 at $133.333% annual interest. Apart from the loan amount and interest rate, the other difference was the addition of a "Joinder of Borrower-Affiliated Entities" which is annexed to the last page of the CPSA (the "February 2025 CSPA").

YSA and its counsel drafted the one-paragraph Joinder (the "February 2025 Joinder") which reflects Mr. Kulick's assumption of Vesta Holding's obligations under the CPA and provides as follows:

> The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain [February CPSA] hereby agrees to jointly and severally assume all obligations of [Vesta Holdings] under the [February CPSA] for all purposes thereof on the terms set forth therein and to be bound by the terms as fully as if the undersigned had personally and individually executed and delivered the [February CPSA] as of the date thereof.

63. Like the October 2024 CPSA, the February 2025 CPSA lists in its recitals the same two categories of membership interests in seventeen Delaware limited liability companies: unencumbered membership interests (defined as the "Unencumbered Interests") owned by Asset Holder (as "Borrower" under the February CPSA) in four of the companies (each defined as a "Borrower Entity"); and encumbered membership interests (defined as the "Encumbered Interests") owned by Vesta Holdings (as "Pledgor" under the February CPSA) in the remaining thirteen companies (each defined as a "Pledgor Entity"). The Unencumbered Interests and Encumbered Interests are defined in the recitals to the October 2024 CPSA as the "Interests." The Borrower Entities and Pledgor Entities are defined in the recitals as the "Entities." Notably, the descriptor "Pledgor Entities" refers to entities in which the Pledgor owned a membership interest; it does not mean that those entities themselves were pledgors, and they were not. The seventeen Entities each hold a direct or beneficial interest in a different property-owning Delaware LLC, which are among some of the Title Owner Plaintiffs.

64. In relevant part, "Collateral" is defined in Section 1.1(a) of the February CPSA as "the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity." "Collateral" also includes the rights as members or interest holders for the defined Interests. The Collateral was limited to membership interests and never included any real estate.

65. The February 2025 CPSA also contains a Power of Attorney clause at Section 4.6 that provides as follows:

> Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exist.

***iii. The April 2025 Loan Transaction***

66. In April 2025, Plaintiff received an additional loan from YSA to finance its acquisition of Parc 1010, an apartment complex in Tulsa, Oklahoma. In this transaction, YSA loaned $300,000 to three entities owned by Kulick Manager, LLC—Parc 1010 Holdco., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC (collectively, the "Parc Entities")—with an annual interest rate of 1,500.00%, which compounds monthly for an effective annual interest rate of 1,683,311.21% (the "April 2025 Loan"). The CPSA for the April 2025 Loan (the "April 2025 CSPA") lists in its recital two categories of membership interests being pledged: encumbered limited partnership interests in an Oklahoma limited partnership, Wellsford Oaks LP; and unencumbered membership interests owned by Kulick Manager, LLC (as "Pledgor" under the April CPSA) in Parc 1010 Holdco., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC. The definition of Collateral under the April CPSA is identical to the definition of that term as set out in the February CPSA. The April CPSA contains a Power of Attorney clause that is identical to

the one in the February CPSA, and the language of the Joinder of Borrower-Affiliated Entities annexed to the April 2025 CPSA (the "April 2025 Joinder") is identical to the February 2025 Joinder. Mr. Kulick is the signatory to the April Joinder.

67. The April 2025 Loan transaction differs from the others at issue in this case in that it contains an additional loan document, a Membership Interest Pledge and Assignment Agreement (the "MIPAA"). Under the MIPAA, which was prepared and required by YSA, Mr. Kulick pledged all his membership interests in Kulick Manager, LLC to secure the obligations of Parc 1010 Holdco., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC. Mr. Kulick represented in the MIPAA that the interests in Kulick Manager, LLC were "free and clear of any material liens, claims, encumbrances or security interests of any kind whatsoever."

***iv. The July 2025 Loan Transactions***

68. On July 16, 2025 and July 31, 2025, Vesta Holdings took additional working capital loans from YSA (the "July 16, 2025 Loan" and "July 31, 2025 Loan" respectively). The loan documents for the July 2025 transactions were in the same form as the loan documents for the February 2025 Loan transaction.

69. The July 16, 2025 Loan was for $365,000, had a maturity date of July 30, 2025, and an annual interest rate of 960%. Interest under the July 16, 2025 Note compounds daily based on a 360-day year.

70. The July 31, 2025 Loan was for $317,000, had a maturity date of August 5, 2025, and an annual interest rate of 7,000%. Interest under the July 31, 2025 Note also compounds daily based on a 360-day year.

71. The July 2025 CPSAs are identical to one another other than the dates listed within. Under both, the recitals list the same two categories of membership interests in seventeen Delaware limited liability companies as listed in the February CPSA. The only difference between the recitals in the July 2025 CPSAs and the recitals in the February 2025 CPSA is that Vesta Holdings is named as both Borrower and Pledgor and is recited to own all seventeen of the membership

interests. In all other respects, including the definition of Collateral and the language of the Joinder and Power of Attorney clause, the three CPSAs (Feb. 18, July 16, and July 31, 2025) are identical.

**C. The Second Mortgages**

72. On October 31, 2025, YSA recorded second mortgages against at least thirty-three multifamily apartment complexes located in Oklahoma, Arkansas, and Kansas and owned by the Title Owner Plaintiffs. YSA purported to record the second mortgages as the attorney-in-fact of Mr. Kulick pursuant to the power of attorney clauses in the CPSAs. Mr. Kulick did not see any of these mortgages before they were filed and did not agree to any of their terms.

73. The effects of the second mortgages were devastating in various ways. Transactions related to the Muntage, Lofts, and Village Creek properties were unable to close. The second mortgages prevent Mr. Kulick from pursuing an out-of-court restructuring plan of selling properties, stabilizing operations, and paying creditors. Investors sued, or threatened, to sue—indicative of the cascade of lawsuits arising out of the second mortgages. The second mortgages also created hundreds of millions of dollars in recourse liability against Mr. Kulick personally.

**D. The Deeds in Lieu of Foreclosure**

74. After recording the second mortgages, YSA delivered, executed, recorded, enforced, asserted, or otherwise used deeds in lieu of foreclosure or similar title-transfer instruments purporting to act on behalf of one or more Title Owner Plaintiffs and purporting to transfer, convey, surrender, assign, or deliver one or more Title Owner properties to YSA or for YSA's benefit.

75. No Title Owner voluntarily negotiated, approved, authorized, executed, delivered, or consented to a deed in lieu of foreclosure or to any transfer of title in favor of YSA.

76. No Title Owner received money, property, reasonably equivalent value, or fair consideration from YSA at any time.

77. YSA was not a senior lender, mortgagee with an agreed deed-in-lieu remedy from the Title Owner Plaintiffs, or conventional foreclosure purchaser of the properties owned by the Title Owner Plaintiffs. The Title Owner Plaintiffs were not parties to the loan documents.

78. The loan documents did not authorize YSA to accept, execute, deliver, record, or enforce a lien or arrange for a deed in lieu of foreclosure on behalf of the Title Owner Plaintiffs.

79. The Joinder did not authorize a lien on the Title Owner's properties or permit a deed in lieu of foreclosure on those properties, did not identify Title Owner properties, did not include legal descriptions, did not appoint YSA to convey real property, and did not authorize YSA to transfer property to itself.

80. The POA did not authorize YSA to convey liens, fee title, deliver deeds, surrender real property, waive foreclosure protections, extinguish equity, accept any deeds from Title Owner Plaintiffs, or act simultaneously as purported agent for the Title Owner Plaintiffs and as transferee or beneficiary to effect liens or transfer title, at any time.

81. Any lien or transfer of ownership interest by YSA with regards to any of the properties was a transfer or attempted transfer of an interest in property, and if recorded, delivered, accepted, enforced, or relied upon, constituted an actual or constructive transfer of real-property interests, estate interests, title rights, equity, redemption rights, management rights, proceeds, and related property rights.

82. Any lien or transfer of ownership interest by YSA with regards to any of the properties was made to or for the benefit of YSA, on account of antecedent, disputed, inflated, and avoidable obligations, for no value.

83. Any lien or transfer of ownership interest was intended to give YSA a lien over or ownership and control of property worth vastly more than the net principal YSA advanced.

84. Any lien or transfer of ownership interest clouded title to the properties, impaired alienability, threatened senior-loan defaults, impaired refinancing and sale efforts, interfered with estate administration, harmed creditor recoveries and jeopardized millions in equity investments.

85. Any lien or transfer of ownership interest, instrument, delivery, recording, notice, acceptance, or enforcement act is avoidable, recoverable, preservable, void, voidable, invalid, unauthorized, unenforceable, and subject to cancellation, turnover, injunctive, and declaratory relief.

86. To the extent YSA attempted imposition of any lien or transfer of any interest after any relevant bankruptcy petition date, the act also violated the automatic stay as an act to obtain a lien over, possession of, exercise control over, create or enforce an interest in, or collect a prepetition claim from estate property.

**E. Loan Economics and Lack of Reasonably Equivalent Value**

87. YSA did not provide reasonably equivalent value for any of the loans.

88. The February 2025 Loan distributed to Asset Holder net cash of $1,288,333.33 at an annual interest rate of 133.333%.

89. The April 2025 Loan distributed to the Parc Entities net cash of $300,000 at an annual interest rate of 1,500.00%, which compounds monthly for an effective annual interest rate of **1,683,311.21%**.

90. The July 16, 2025 Loan distributed to Vesta Holdings net cash of $365,000 at an annual interest rate of 960%, which compounds daily based on a 360-day year for an effective annual interest rate of **1,301,855.78%**. As of September 12, 2025, YSA claimed payoff of $4,841,359.83, which included $3,476,359.83 in accrued interest and late charges and a $1,000,000 penalty.

91. The July 31, 2025 Loan provided Vesta Holdings with $317,000 net cash at an annual interest rate of 7,000%, which compounds daily based on a 360-day year for an effective annual interest rate of **14 octillion (14 billion billion billion) percent ($1.4641093\times10^{28}$%).**, As of September 12, 2025, YSA claimed payoff of $921,057,361.28, which included $919,740,361.28 in interest. As of July 6, 2026, the outstanding loan balance purports to be **$1,944,484,638,474,570,000,000,000,000,000,000.**

92. If the Court determines YSA gave value in the form of net principal actually funded, Plaintiffs seek avoidance and disallowance of all obligations, liens, mortgages, and charges exceeding such value, less payments already made.

**F. The Collateral Was Membership Interests, Not Real Property**

93. The CPSAs defined collateral by reference to "Interests" in "Entities."

94. The collateral definition did not say "real property," "mortgage," "apartment complexes," or the real property owned by the Title Owner Plaintiffs.

95. The CPSAs did not include legal descriptions of real property.

96. The CPSAs contemplated UCC filings against membership-interest collateral, not real estate mortgage filings against non-borrower Title Owner Plaintiffs.

**G. The Joinder**

97. The Joinder does not list a Title Owner, property address, legal description, mortgage grant, county recording reference, or real-property collateral description.

98. The Joinder does not say "real property," "second mortgage," "apartment complex," or "Title Owner."

99. The Joinder purports only to bind certain affiliated entities to obligations of the Pledgor under the CPSA. The Joinder does not create a real-property mortgage.

**H. The Power of Attorney**

100. YSA's mortgage-recording and deed-in-lieu theory also depends on the CPSA power-of-attorney clause.

101. YSA's asserted chain is: the Joinder binds affiliates to the CPSA; the CPSA contains a POA; the POA lets YSA do whatever it deems necessary; therefore YSA can create mortgages and subsequently transfer the real estate by deed in lieu or otherwise. Each link is defective.

102. YSA did not record the second mortgages as a conventional mortgagee receiving conventional mortgage grants from Title Owner Plaintiffs at loan closings. YSA recorded the second mortgages by purporting to act as attorney-in-fact after the primary obligor's defaults. No Title Owner granted YSA a lien or transferred title through a traditional mortgage or negotiated conveyance documents. There exist no board or member approvals, payoff agreements, foreclosure alternatives, title-owner consents, or senior-lender approvals. Instead, YSA used self

help to deliver, execute and record liens and transfer documents of the Title Owner Plaintiffs' properties.

103. The POA does not mention Title Owner Plaintiffs, identify properties, contain legal descriptions, grant a mortgage, create new real-property collateral, or authorize YSA to convert membership-interest collateral into real-property mortgage collateral. The POA clause also does not authorize YSA to execute or deliver a deed in lieu of foreclosure, convey fee title, surrender estate property, waive foreclosure protections, accept title on its own behalf, act on both sides of a conveyance, or transfer real property owned by the Title Owner Plaintiffs to YSA.

104. The POA itself is an avoidable instrument, and was not granted in exchange for reasonably equivalent value.

**I. YSA Did Not Act in Good Faith**

105. YSA was not an ordinary lender making a secured loan.

106. YSA knew or should have known the loan documents did not contain ordinary mortgage grants or real-property descriptions.

107. YSA knew or should have known the POA did not create new collateral or authorize a lender to manufacture mortgages or deed-in-lieu title transfers for no new value.

108. YSA refused to provide payoff information when requested and later demanded nearly $1 billion.

109. YSA threatened reputational harm, including threatened notices to investors, lenders, and Kulick's rabbi.

110. YSA has publicly announced that it owns the properties owned by the Title Owner Plaintiffs.

111. YSA's conduct defeats any assertion that YSA took in good faith or for value within the meaning of 11 U.S.C. § 548(c). YSA cannot claim good faith or value for making the loans, recording the second mortgages or the deed-in-lieu transactions it attempted without ordinary conveyance authority and under a POA that did not authorize YSA to convey Title Owner property to itself.

**J. The Second Mortgages, Membership Foreclosures, and Deeds in Lieu Transfers**

112. On or about October 31, 2025, YSA recorded second mortgages against at least twenty-five of the properties. YSA then purported to perfect and foreclose upon the Title Owner Plaintiffs' membership interests. Thereafter, YSA attempted to transfer the properties to itself via various deeds, including deeds in lieu of foreclosure. YSA was the signor for all of these purported transactions, and signed for both sides when two signatures were required to effect any purported lien or transfer.

113. The recording and perfection of each second mortgage and any delivery, execution, recording, acceptance, enforcement, assertion, or use of any deed in lieu of foreclosure or similar title-transfer instrument constituted a transfer or attempted transfer of an interest in property and/or perfection of a transfer for purposes of §§ 544, 547 if applicable, and 548.

114. The properties are owned by Title Owner Plaintiffs, not by the borrowers identified in the loan documents. The Title Owner Plaintiffs never authorized the borrowers to pledge their properties as collateral for the loans.

115. YSA purported to record the mortgages and to deliver, execute, record, enforce, or use the deed in lieu of foreclosure as attorney-in-fact under the CPSA powers of attorney.

**K. Insolvency, Unreasonably Small Capital, and Inability to Pay**

116. Plaintiffs were insolvent, rendered insolvent, left with unreasonably small capital, or unable to pay debts as they matured when the loans were made and, later, when any liens were imposed and the properties purportedly transferred.

117. If YSA's asserted obligations extend to the Plaintiffs at the time the loans were made, despite Plaintiffs not being parties to the loans, then the Plaintiffs were rendered insolvent when the loans were made. If the Plaintiffs' properties became at risk when the liens were imposed or transfers made, then the Plaintiffs were rendered insolvent at that time. No single property, nor the entirety of the affiliated enterprise, could conceivably sustain a billion dollar claim.

**L. Integrated Transaction and Collapsing Allegations**

118. The Notes, CPSAs, Joinders, Guaranties, POAs, MIPAAs, UCC filings, purported perfection and foreclosure of alleged membership-interest collateral, mortgage recordings, deed-in-lieu instruments or attempted deed-in-lieu transfers, and foreclosure/control acts were parts of one integrated lending and enforcement scheme.

119. They should be collapsed for purposes of determining reasonably equivalent value.

120. YSA used each successive document not primarily to provide new value, but to increase leverage over the same enterprise and secure antecedent, inflated, or avoidable obligations.

121. The second mortgages were one step in the same scheme: transform membership-interest collateral and disputed hard-money debt into portfolio-wide real estate leverage. The deed-in-lieu attempt and purported ownership transfers was a further and more extreme step in the same scheme: transform disputed, inflated loan obligations and defective POA language into purported ownership or control of Title Owner real property.

**M. Transfers and Obligations Plaintiffs Seek to Avoid**

122. Plaintiffs seek to avoid, recover, preserve, disallow, reduce, subordinate, cancel, rescind, declare void or voidable, and enjoin enforcement of the following transfers and obligations, without limitation:

(a) the February 2025 Note obligations;

(b) the February 2025 CPSA obligations;

(c) the February 2025 Joinder obligations;

(d) the February 2025 POA obligations;

(e) the April 2025 Note obligations;

(f) the April 2025 CPSA obligations;

(g) the April 2025 Joinder obligations;

(h) the April 2025 MIPAA, assignment, and control obligations;

(i) the July 16, 2025 Note obligations;

(j) the July 16, 2025 CPSA obligations;

(k) the July 16, 2025 Joinder obligations;

(l) the July 16, 2025 POA obligations;

(m) the July 31, 2025 Note obligations;

(n) the July 31, 2025CPSA obligations;

(o) the July 31, 2025 Joinder obligations;

(p) the July 31, 2025POA obligations;

(q) the $1 million affiliate-loan penalties;

(r) the minimum payoff amounts;

(s) the default interest obligations;

(t) the compounding interest obligations;

(u) the confession-of-judgment obligations;

(v) the pledge of Collateral (as defined in the loan documents);

(w) the second mortgages recorded on or about October 31, 2025 or at any time concerning the properties owned by Title Owner Plaintiffs, and any amendments, assignments, notices, enforcement acts, foreclosure acts, or related instruments concerning those second mortgages;

(x) YSA's purported perfection, transfer, foreclosure of pledged membership interests, Vesta Holdings membership interests, or Title Owner real property, and any UCC filings;

(y) any deed in lieu of foreclosure, attempted deed in lieu of foreclosure, deed, special warranty deed, quitclaim deed, foreclosure deed, conveyance instrument, assignment, title-transfer document, escrow instruction, delivery instruction, recording submission, notice, acceptance, demand, or other instrument or act by which YSA purported to transfer, convey, surrender, assign, accept, obtain, enforce, or control any property, title, equity, redemption right, ownership right, or estate interest of any Title Owner or Debtor Plaintiff;

(z) any purported transfer by YSA to itself, or to any designee, affiliate, nominee, agent, title company, escrow agent, receiver, custodian, or other person or entity acting for YSA, of any real property owned by the Title Owner Plaintiffs;

(aa) any purported waiver, release, satisfaction, merger, extinguishment, impairment, or transfer of any Title Owner's ownership interest, equity, redemption right, defense, claim, counterclaim, title right, possession right, management right, rent right, proceeds right, or other property right arising from or relating to any deed-in-lieu transaction;

(bb) any title-clouding, title-transfer, possession-transfer, rent-transfer, account-control, management-control, or property-control act taken in connection with any deed in lieu of foreclosure or attempted deed-in-lieu transaction;

(cc) the mortgage on Mr. Kulick's personal residence;

(dd) any payments made to YSA within applicable lookback periods;

(ee) any lien perfection transfer or title-transfer act made within any applicable preference period; and

(ff) all related charges, deeds, conveyances, assignments, title rights, possession rights, foreclosure rights, deed-in-lieu rights, fees, penalties, liens, interests, rights, and remedies.

**N. The Delaware Order Does Not Preclude This Bankruptcy Proceeding**

123. Before bankruptcy, Mr. Kulick, Vesta Holdings and Asset Holder (the "Kulick Entities") sought mandatory injunctive relief in the Delaware Court of Chancery ("Delaware Court") requiring YSA to release the second mortgages.

124. The Delaware Court denied mandatory permanent injunctive relief.

125. The Delaware Court applied a heightened standard. The Kulick Entities were required to "clearly establish" a legal right to the mandatory relief sought.

126. The Delaware Action involved a prepetition request for mandatory injunctive relief under Delaware law. This adversary proceeding involves federal statutory avoidance powers belonging to the bankruptcy estates and exercised for the benefit of creditors.

127. The issues are not identical. The Delaware Court decided whether the Kulick Entities clearly established a contractual entitlement to mandatory injunctive relief. It did not decide reasonably equivalent value, avoidability, claim allowance, claim estimation, lien preservation, turnover, equitable subordination, secured status, or the avoidability, invalidity, cancellation, turnover, stay effect, or enforceability of any deed in lieu of foreclosure or attempted deed-in-lieu transfer.

128. The causes of action are not identical. Claims under §§ 544, 547, 548, 550, 551, 502, 506, 510(c), and 542 did not exist as estate causes of action before the bankruptcy petition.

129. The parties are not identical. None of the plaintiffs to the Delaware Court action are plaintiffs in this adversary proceeding.

130. To the extent the Delaware Court construed the loan documents, Plaintiffs do not ask this Court to ignore that ruling. Plaintiffs allege that even if YSA had contractual authority under Delaware law to act, the resulting obligations and transfers remain avoidable, recoverable, disallowable, reducible, subordinable, or subject to turnover under federal bankruptcy law.

131. The Delaware Court's ruling that LLC borrowers could not assert a usury defense under Delaware law does not decide whether Plaintiffs received reasonably equivalent value under § 548 or whether YSA's claim may be allowed under § 502.

132. The Delaware Order is not a shield against the Bankruptcy Code.

**O. YSA's Postpetition Lawsuit Against Entrata and Violation of the Automatic Stay**

133. After the commencement of the Chapter 11 cases of the debtor Title Owner Plaintiffs, YSA had actual knowledge of the bankruptcy filings, have entered appearances in certain of the bankruptcy cases, and the resulting automatic stay.

134. YSA knew that the Debtor Plaintiffs were operating in Chapter 11, that property of their estates included their real property, contract rights, management rights, accounts, revenues,

claims, defenses, proceeds, and related rights, and that the automatic stay prohibited acts to obtain possession of, exercise control over, or interfere with estate property.

135. On July 1, 2026, YSA nevertheless commenced a lawsuit against Entrata, Inc., EntrataPay, LLC, Entrata Software, LLC (collectively, "Entrata"), and Worldpay, LLC, captioned Y*SA Investments 1, LLC v. Entrata, Inc., et al.*, Case No. 2026-0866, pending in the Court of Chancery of the State of Delaware (the "Entrata Action"). On July 20, 2026, YSA dismissed the Entrata Action. The dismissal does not cure YSA's prior stay violation, does not moot Plaintiffs' request for a declaration that YSA's commencement and prosecution of the Entrata Action violated the automatic stay, and does not eliminate Plaintiffs' claims for damages, attorneys' fees, costs, sanctions, claim disallowance, offset, or other relief arising from the violation.

136. Entrata provides property-management, leasing, rent-processing, resident-portal, accounting, software, data, or related services used in connection with properties owned, managed, or operated through the Louis Investments/Vesta enterprise, including properties owned by the Debtor Plaintiffs.

137. The Entrata Action was not an ordinary dispute between YSA and a stranger to the estates. YSA filed the Entrata Action to interfere with, seize leverage over, obtain information concerning, restrain, redirect, impair, or exercise control over property, contract rights, data, revenues, accounts, management operations, and business relationships used by or belonging to the Debtor Plaintiffs and their estates. Although Entrata dismissed the Entrata Action, the filing and prosecution of the Entrata Action before dismissal caused and threatened harm to the estates and required Plaintiffs to respond to and address YSA's stay-violating conduct.

138. The Entrata Action directly targeted the operational infrastructure through which the Debtor Plaintiffs manage, stabilize, lease, collect rents from, account for, and preserve estate property.

139. The claims and relief YSA asserted or sought in the Entrata Action included, upon information and belief, relief concerning Entrata's services, records, data, accounts, contracts,

access rights, revenue streams, property-management functions, or other rights used by or for the benefit of the Debtor Plaintiffs and their bankruptcy estates.

140. By filing or continuing the Entrata Action, YSA sought to obtain possession of, exercise control over, or interfere with property of the estates, including rents, estate contract rights, business records, data, accounts, proceeds, management rights, claims, defenses, and other legal or equitable interests of the Debtor Plaintiffs.

141. The Entrata Action also constituted an act to collect, assess, recover, secure, or enforce YSA's prepetition claims against the Debtor Plaintiffs and their property by pressuring a critical service provider and interfering with estate operations.

142. YSA did not obtain relief from the automatic stay before commencing or continuing the Entrata Action.

143. YSA did not seek or obtain authority from this Court to sue Entrata for the purpose of affecting estate property, estate rights, estate accounts, estate operations, or estate service relationships.

144. YSA's violation was willful because YSA knew of the bankruptcy cases and intentionally filed, prosecuted, maintained, threatened, or refused to dismiss the Entrata Action despite that knowledge.

145. YSA's potential defense that it was suing a non-debtor does not excuse the violation because the automatic stay protects estate property and prohibits acts to obtain possession of, exercise control over, or interfere with estate property, whether the act is styled as a lawsuit against the debtor or as a lawsuit against a third party holding, servicing, processing, or controlling estate property or estate-related rights.

146. YSA's conduct injured the estates by interfering with estate operations, threatening interruption of critical property-management and revenue functions, increasing administrative costs, distracting management, impairing reorganization efforts, and forcing the Debtor Plaintiffs to incur attorneys' fees and expenses to address the stay violation.

147. Any filings, orders, restraints, discovery demands, subpoenas, injunction requests, notices, claims, rights, or relief obtained by YSA in or through the Entrata Action after the Petition Date were void or voidable as acts taken in violation of the automatic stay. To the extent any such filing, demand, notice, subpoena, communication, claim, right, or asserted relief had any effect before dismissal or continues to have any residual effect after dismissal, Plaintiffs seek an order declaring it void or voidable, requiring YSA to withdraw and cease reliance on it, and awarding damages, fees, costs, and sanctions caused by it.

148. YSA should be required to withdraw, vacate, rescind, cancel, and take all steps necessary to unwind any filing, relief, discovery, notice, subpoena, claim, demand, communication, or other act issued, served, obtained, or made in connection with the Entrata Action before its dismissal, to the extent any such act had or continues to have any effect on estate property, estate rights, estate operations, or estate service relationships.

149. YSA should also be enjoined from commencing, maintaining, prosecuting, threatening, or taking discovery in any action against Entrata or any other property-management, software, payment-processing, accounting, rent-collection, leasing, data, or operational vendor to the extent the action seeks to obtain possession of, exercise control over, interfere with, collect from, or affect property of the Debtor Plaintiffs' estates without first obtaining relief from the automatic stay. The dismissal of the Entrata Action makes prospective relief concerning that specific pending action unnecessary, but Plaintiffs continue to seek prospective relief preventing YSA from repeating the same stay-violating conduct against Entrata or any other vendor or service provider.

### P. YSA's July 20, 2026 Self-Help Takeover Conduct Violated the Automatic Stay and Wrongfully Expelled Title Owner Plaintiffs, Including Debtor Plaintiffs, From Possession

150. On July 20, 2026, YSA escalated its efforts from recording disputed liens and asserting disputed title-transfer rights to physically taking possession of and exerting control over properties through self-help.

151. On that date, YSA, acting without stay relief, without any eviction order, writ of possession, receivership order, turnover order, or other court authorization, forcibly entered properties, used or directed competing management personnel and law enforcement, and took steps to expel Title Owner Plaintiffs, including debtor Plaintiffs, from possession and operational control.

152. YSA's July 20 conduct included lock changes, exclusion of existing management personnel, trespass threats, threats of arrest or ticketing, and the assertion of disputed deed, deed-in-lieu, mortgage, title, POA, or other claimed control rights as a basis for immediate physical takeover.

153. Those actions were undertaken to obtain possession of, exercise control over, and interfere with estate property, estate-related rights, property operations, management rights, offices, records, software access, rent systems, tenant relationships, vendor relationships, and the ongoing administration of the Debtor Plaintiffs' Chapter 11 cases.

154. YSA wrongfully expelled at least ten Title Owner Plaintiffs from possession of their real property, including five Debtor Plaintiffs:

a. 727 Lofts Best Living, LLC, USBC ND TX Case No. 26- 32779;

b. Barcelona Best Living, LLC, USBC ND TX Case No. 26-33093;

c. A-V Village Creek Owner LLC, USBC ND TX Case No. 26-32922;

d. A-V 23 East Owner, LLC;

e. Villas at Midtown Best Living LLC;

f. Riverpark Best Living LLC;

g. One Eton Square LLC;

h. One Eton TIC 1, LLC;

i. Lakeside Best Living, LLC; and

j. Shoreline's Best Living, LLC.

155. Louis Investments filed a separate adversary proceeding (AP No. 26-03071) addressing the July 20, 2026 takeover conduct in greater factual detail and seeking specific relief

tailored to those events. YSA's July 20 takeover conduct is part of the same broader pattern of stay violations, self-help enforcement, and unlawful efforts to seize control of estate-related property and operations. Such conduct caused additional harm to the estates and creditors by disrupting operations, increasing administrative expense, impairing property value, threatening tenant and vendor relationships, interfering with management rights, and forcing Plaintiffs to incur attorneys' fees and costs to respond to the stay violations and restore the status quo.

## COUNT I — CONSTRUCTIVE FRAUDULENT TRANSFERS AND OBLIGATIONS UNDER 11 U.S.C. § 548(a)(1)(B)

**(on behalf of the Debtor Plaintiffs only)**

156. Plaintiffs incorporate all prior allegations as though fully set forth herein.

157. Within two years before the Petition Date, Debtor Plaintiffs' interests in property were transferred to YSA and obligations were incurred in favor to YSA.

158. Each Note, CPSA, Joinder, Guaranty, POA, MIPAA, minimum payoff provision, affiliate-loan penalty, confession-of-judgment provision, default-interest provision, lien grant, membership-interest pledge, perfection act, purported foreclosure upon membership interests, alleged mortgage-authorizing, deed-in-lieu instrument or attempted deed-in-lieu transfer, title-transfer instrument, and foreclosure/control provision constituted an "obligation incurred" or "transfer" within the meaning of § 548.

159. At the time the challenged transfers were made and the challenged obligations were incurred, the Debtor Plaintiffs were indebted to existing creditors. In addition to creditors existing at the time of the transfers and obligations, Plaintiffs also became indebted to additional creditors after the transfers were made and obligations were incurred.

160. Debtor Plaintiffs received less than reasonably equivalent value for those transfers and obligations.

161. Debtor Plaintiffs did not receive reasonably equivalent value for the excessive monetary obligations, including interest, default interest, compounding, minimum payoff amounts, $1 million penalties, attorneys' fees, and confession-of-judgment amounts.

162. Debtor Plaintiffs did not receive reasonably equivalent value for collateral-expansion obligations, including the joinders, POAs, MIPAA, UCC/security grants, consent-to-sale provisions, and control provisions.

163. Debtor Plaintiffs did not receive reasonably equivalent value for the second mortgages or any deed in lieu of foreclosure, attempted deed in lieu, title-transfer instrument, delivery, recording, purported perfection and foreclosure of membership interests, acceptance, enforcement act, title transfer, control transfer, or related conveyance act recorded or attempted after the loan advances and for no new money.

164. Debtor Plaintiffs were insolvent, rendered insolvent, left with unreasonably small capital, or unable to pay debts as they matured when the transfers were made or obligations incurred.

165. YSA, purporting to act on behalf of the Debtor Plaintiffs, knew when it recorded second mortgages and deeds in lieu of foreclosure that the debts incurred by the obligors on the loans, purportedly supported by Debtor Plaintiff's property, would be beyond the obligators or Debtor Plaintiffs' ability to pay as such debts matured.

166. The transfers and obligations, including any lien, collateral grant, membership-interest pledge, perfection act, foreclosure upon membership interests, deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance instrument, title-transfer act, delivery, recording, acceptance, enforcement act, or related transfer, are avoidable under 11 U.S.C. § 548(a)(1)(B).

167. Alternatively, if the Court determines YSA gave value in the amount of net principal actually funded, Debtor Plaintiffs seek avoidance and disallowance of all obligations, liens, transfers and charges exceeding such value, less payments already made.

## COUNT II — ACTUAL FRAUDULENT TRANSFERS AND OBLIGATIONS UNDER 11 U.S.C. § 548(a)(1)(A)

**(on behalf of the Debtor Plaintiffs only)**

168. Plaintiffs incorporate all prior allegations as though fully set forth herein.

169. YSA's loan, transfers and obligations were made or incurred with actual intent to hinder, delay, or defraud creditors, including YSA's recordation of the second mortgages and the deeds in lieu of foreclosure, while purporting to act on behalf of the Debtor Plaintiffs.

170. YSA made the loans and then, acting through its agents, used the joinders and POAs in or around October 2025 to record second mortgages against at least twenty-five properties, then attempted to use the same defective joinder-and-POA theory to purportedly foreclose on membership interests and deliver, execute, record, enforce, or otherwise use a deed in lieu of foreclosure or other transfer of title instruments purporting to transfer Title Owner property to YSA or for YSA's benefit, refused to provide a payoff when requested, threatened reputational harm to Kulick through preservation notices to investors, lenders, and his rabbi, and later demanded nearly $1 billion as the price of releasing the loans and mortgages.

171. The badges of fraud include grossly inadequate value, financial distress, coercive lender conduct, insider-like control provisions, threats, refusal to provide payoff information, mortgage recordings against non-borrower property, purported foreclosure upon membership interests, attempted self-dealing deed-in-lieu transfers to YSA or for YSA's benefit, title-clouding conduct, blocked transactions, and seizure/control efforts.

172. At the time the challenged transfers were made and the challenged obligations were incurred, the Debtor Plaintiffs were indebted to existing creditors. In addition to creditors existing at the time of the transfers and obligations, Plaintiffs also became indebted to additional creditors after the transfers were made and obligations were incurred.

173. YSA's conduct hindered and delayed Debtor Plaintiffs' creditors by blocking transactions that could have generated liquidity.

174. YSA's conduct defrauded creditors by converting modest loan advances into asserted obligations, liens, deed-in-lieu rights, purported title-transfer rights, wildly disproportionate to value provided.

175. The loans, transfers and obligations, including any perfection act, foreclosure upon membership interests, deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance

instrument, title-transfer act, delivery, recording, acceptance, enforcement act, or related transfer, are avoidable under 11 U.S.C. § 548(a)(1)(A).

## COUNT III — STATE-LAW FRAUDULENT TRANSFER AVOIDANCE UNDER 11 U.S.C. § 544(b), INCLUDING DELAWARE, TEXAS, AND OKLAHOMA UFTA/UVTA CLAIMS

**(on behalf of the Debtor Plaintiffs only)**

176. Plaintiffs incorporate all prior allegations as though fully set forth herein.

177. Debtor Plaintiffs, as debtors-in-possession and as entities whose properties were directly encumbered by YSA's second mortgages, may avoid the loans, transfers and obligations avoidable by an actual unsecured creditor under 11 U.S.C. § 544(b) and applicable nonbankruptcy law.

178. Applicable state fraudulent-transfer law includes, without limitation, the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301 *et seq*.; the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.001 *et seq*.; and the Oklahoma Uniform Fraudulent Transfer Act, 24 Okla. Stat. § 112 *et seq*.

179. Under each of the Delaware, Texas, and Oklahoma UFTA/UVTA regimes, the loans, obligations, joinders, POAs, membership-interest pledges, perfection acts, purported foreclosures upon membership interests, liens, mortgages, deed-in-lieu instruments or attempts, title-transfer instruments or attempts, control transfers, and related transfers are avoidable because they were incurred or made with actual intent to hinder, delay, or defraud creditors.

180. At the time the challenged transfers were made and the challenged obligations were incurred, the Debtor Plaintiffs were indebted to existing creditors. In addition to creditors existing at the time of the transfers and obligations, Plaintiffs also became indebted to additional creditors after the transfers were made and obligations were incurred.

181. The badges of fraud include YSA's minimal net funding to the borrower obligors, grossly disproportionate claim inflation, lack of any new value when recording second mortgages, perfecting or purportedly foreclosing upon membership interests, recording deeds in lieu of

foreclosure, effecting any property , use of self-help POA recordings, attempted self-help conveyance of Title Owner property, threats and pressure tactics, refusal to provide payoff information, title-clouding conduct, and interference with sales/refinancings that would have generated liquidity for creditors.

182. Under each of the Delaware, Texas, and Oklahoma UFTA/UVTA regimes, the loans, obligations, joinders, POAs, membership-interest pledges, perfection acts, purported foreclosures upon membership interests, liens, mortgages, control transfers, and related transfers are also avoidable because Debtor Plaintiffs did not receive reasonably equivalent value and were insolvent, rendered insolvent, left with unreasonably small capital, or unable to pay debts as they matured.

183. Debtor Plaintiffs may avoid the loans, obligations and transfers, including any deed in lieu of foreclosure, attempted deed in lieu, title-transfer instrument, delivery, recording, acceptance, enforcement act, or related transfer, under 11 U.S.C. § 544(b) and Delaware, Texas, and Oklahoma fraudulent-transfer law.

**COUNT IV — STRONG-ARM AVOIDANCE UNDER 11 U.S.C. § 544(a)**

**(on behalf of the Debtor Plaintiffs only)**

184. Plaintiffs incorporate all prior allegations as though fully set forth herein.

185. Debtor Plaintiffs, as debtors-in-possession, have the rights of a hypothetical lien creditor and bona fide purchaser under 11 U.S.C. § 544(a).

186. YSA's asserted mortgages, liens, security interests, assignments, deed-in-lieu instruments, deeds, conveyance instruments, title-transfer instruments, foreclosure rights, and control rights are avoidable to the extent unperfected, defectively perfected, unauthorized, improperly recorded, outside the chain of title, lacking adequate property descriptions, unsupported by a proper grantor, or otherwise avoidable by a hypothetical lien creditor or purchaser.

187. The second mortgages, purported foreclosure upon any membership interests, and any deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance instrument, title-transfer

instrument, delivery, recording, acceptance, enforcement act, or related transfer are avoidable because the loan documents did not grant real property mortgages, did not authorize deeds in lieu of foreclosure, did not authorize YSA to transfer property to itself, did not describe real property, did not list Title Owner Plaintiffs, and did not provide ordinary mortgage authority.

188. Any Joinder and POAs do not cure these defects.

189. Debtor Plaintiffs may avoid YSA's asserted liens, deeds, deed-in-lieu instruments, title-transfer instruments, and interests under § 544(a).

**COUNT V — PREFERENTIAL TRANSFERS UNDER 11 U.S.C. § 547**

**(on behalf of the Debtor Plaintiffs only)**

190. Plaintiffs incorporate all prior allegations as though fully set forth herein.

191. To the extent any loan, lien, mortgage, UCC filing, perfection act, payment, foreclosure act, deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance instrument, title-transfer act, delivery, recording, acceptance, enforcement act, control transfer, or other transfer occurred within the applicable preference period before the Petition Date, such transfer was to or for the benefit of YSA, on account of antecedent debt, while Debtor Plaintiffs were insolvent, and enabled YSA to receive more than it would receive in a hypothetical Chapter 7 liquidation.

192. The 90-day preference-period transfers pursuant to 11 U.S.C. § 547(b)(4)(A) include, without limitation, YSA's recording, delivery, acceptance, enforcement, or use of deeds in lieu of foreclosure or similar title-transfer instruments purporting to transfer, convey, surrender, assign, or deliver Title Owner property to YSA or for YSA's benefit.

193. The second mortgage recordings and deed-in-lieu recordings occurred within one year before the Petition Date and are avoidable under 11 U.S.C. § 547(b)(4)(B) because YSA was an insider of the Debtor Plaintiffs when those transfers were made.

194. YSA was an insider for purposes of § 547(b)(4)(B) because, by purporting to act as attorney-in-fact, agent, transferor, signatory, or authorized representative for the Debtor Plaintiffs and/or Title Owner Plaintiffs when recording the second mortgages and deeds in lieu of

foreclosure, YSA purported to assume and exercise a position of control, agency, and influence over the Debtor Plaintiffs' property and affairs. YSA used that purported insider-like authority to cause transfers from the Debtor Plaintiffs to itself or for its own benefit.

195. YSA's insider status is further supported by its assertion that it could act on behalf of the Debtor Plaintiffs through powers of attorney, joinders, deeds in lieu, title-transfer instruments, and other purported self-help documents, while simultaneously acting as the beneficiary, transferee, secured party, or recipient of the transfers it caused.

196. YSA's dual role—purporting to act for the Debtor Plaintiffs while causing liens, title transfers, and other property interests to be recorded in favor of YSA—placed YSA in a position materially different from an ordinary arm's-length creditor. YSA used that position to obtain preferential transfers during the one-year insider preference period.

197. At the time of the second mortgage recordings and deed-in-lieu recordings, Debtor Plaintiffs were insolvent or are presumed insolvent to the extent the transfers occurred during the ninety days before the Petition Date. Debtor Plaintiffs also plead insolvency independently based on the allegations above, including YSA's asserted payoff demands, the claimed debt burdens, the clouding of title, and the impairment of refinancing, sale, and restructuring efforts.

198. The second mortgage recordings and deed-in-lieu recordings enabled YSA to receive more than it would have received in a hypothetical Chapter 7 liquidation because, absent those recordings and transfers, YSA would not have held the same asserted liens, title rights, control rights, or priority position in the Debtor Plaintiffs' property and estate-related interests

199. Any such preferential transfer, including any second mortgage recording, deed in lieu of foreclosure, attempted deed in lieu of foreclosure, deed, conveyance instrument, title-transfer act, delivery, recording, acceptance, enforcement act, or related transfer occurring during the applicable preference period, including the one-year insider preference period, is avoidable under 11 U.S.C. § 547.

200. Debtor Plaintiffs preserve all preference rights pending confirmation of the relevant transfer dates, petition date, transferee status, YSA's insider status, the dates of the second

mortgage recordings, the dates of the deed-in-lieu recordings, and the scope of all transfers or perfection acts made to or for YSA's benefit.

**COUNT VI — RECOVERY AND PRESERVATION UNDER 11 U.S.C. §§ 550 AND 551**

**(on behalf of the Debtor Plaintiffs only)**

201. Plaintiffs incorporate all prior allegations as though fully set forth herein.

202. To the extent any transfer is avoided under §§ 544, 547, 548, or other law, Debtor Plaintiffs may recover the transferred property or its value from YSA or any immediate or mediate transferee, beneficiary, designee, nominee, affiliate, agent, title company, escrow agent, custodian, or other person or entity for whose benefit the transfer was made under 11 U.S.C. § 550.

203. Avoided liens, mortgages, security interests, membership-interest pledges, perfection acts, foreclosures, deeds, deed-in-lieu transfers, title transfers, conveyance instruments, and transfers are for the benefit of the estates under 11 U.S.C. § 551.

204. To the extent any deed in lieu of foreclosure or title-transfer instrument is avoided, Debtor Plaintiffs seek recovery of title, possession, equity, proceeds, rents, records, rights, and value transferred or purportedly transferred, and preservation of any avoided transfer for the benefit of the estates.

**COUNT VII - VIOLATION OF THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(a)**

**(on behalf of the Debtor Plaintiffs only)**

205. Debtor Plaintiffs incorporate all prior allegations as though fully set forth herein.

206. The automatic stay is a statutory injunction that protects the Debtor Plaintiffs, their estates, estate property, and the orderly administration of these Chapter 11 cases. YSA dismissed the Entrata Action on July 20, 2026, but that dismissal does not change the fact that YSA commenced and prosecuted the action without stay relief after the Petition Date.

207. YSA had notice of the bankruptcy cases and no objectively reasonable basis to conclude that it could file, prosecute, maintain, threaten, or refrain from dismissing the Entrata Action to the extent that action sought to obtain possession of, exercise control over, interfere with,

collect from, or affect estate property, estate rights, estate accounts, estate operations, or estate service relationships.

208. YSA also, on July 20, 2026, forcibly entered and took steps to expel Title Owner Plaintiffs, including Debtor Plaintiffs, from possession and operational control of properties without obtaining relief from the automatic stay and without any court order authorizing possession, eviction, exclusion, lock changes, or management displacement.

209. YSA's conduct violated a clear and unambiguous statutory stay. The Entrata Action violated 11 U.S.C. § 362(a) because it was an act to obtain possession of, exercise control over, interfere with, or affect estate property, including estate contract rights, accounts, rents, revenues, data, records, proceeds, business operations, management rights, claims, defenses, and vendor relationships. YSA's July 20, 2026 takeover conduct likewise violated 11 U.S.C. § 362(a) because it was an act to enforce disputed prepetition claims, liens, title-transfer theories, deed-in-lieu theories, mortgage theories, or control rights, and obtain possession of, exercise control over, and interfere with estate property and estate-related rights, including management rights, possession rights, offices, operational control, records, accounts, rents, software access, tenant relationships, vendor relationships, and other property interests and operations protected by the automatic stay.__

210. YSA's conduct was intentional, willful, malicious, coercive, and designed to improve YSA's leverage against the Debtor Plaintiffs and their estates.

211. YSA's conduct harmed the estates by interfering with operations, threatening disruption of critical services, increasing administrative expenses, impairing reorganization efforts, and requiring Debtor Plaintiffs to incur attorneys' fees and costs.

212. Civil contempt sanctions are necessary to compensate the estates, coerce compliance, remedy the consequences of YSA's stay violation, and deter further violations.

213. Debtor Plaintiffs are entitled to an award of compensatory sanctions, including attorneys' fees and costs, punitive damages, and to coercive sanctions if YSA fails to withdraw, vacate, unwind, cease reliance on, and remediate all stay-violating conduct related to the Entrata Action, notwithstanding Entrata's dismissal of that action, and the July 20 takeover.

## COUNT VIII — DECLARATORY JUDGMENT REGARDING VALIDITY, EXTENT, PRIORITY, AND ENFORCEABILITY

**(on behalf of all Plaintiffs)**

214. Plaintiffs incorporate all prior allegations as though fully set forth herein.

215. An actual controversy exists concerning the validity, extent, priority, and enforceability of YSA's loans, claims, liens, mortgages, security interests, membership-interest pledges, perfection acts, purported foreclosures upon membership interests, joinders, powers of attorney, deeds in lieu of foreclosure, attempted title-transfer instruments, foreclosure rights, and control rights. Entrata's dismissal of the Entrata Action does not eliminate this controversy because Plaintiffs seek declarations, damages, sanctions, fees, costs, claim relief, and protection against recurrence of the same conduct.

216. An actual controversy also exists concerning whether YSA's postpetition filing, prosecution, maintenance, threatened prosecution, or refusal to dismiss the Entrata Action violated the automatic stay and whether all acts taken in connection with the Entrata Action are void or voidable.

217. An actual controversy also exists concerning whether YSA's July 20, 2026 self-help takeover conduct, including forcible entry, expulsion from possession, lock changes, trespass threats, management displacement, and other acts taken without court process, violated the automatic stay and is void or voidable.

218. Plaintiffs seek declarations on behalf of the Debtor Plaintiffs and/or Non-Debtor Plaintiffs, as applicable, that:

a. YSA's loans and claims are unenforceable, avoidable, or disallowable to the extent they exceed value actually provided;

b. YSA's excessive interest, penalties, minimum payoff amounts, default charges, and affiliate-loan penalties are unenforceable or disallowable;

c. the joinders did not grant real property mortgages;

d. the powers of attorney did not create unavoidable real property lien rights;

e. the second mortgages are invalid, avoidable, or unenforceable to the extent they affect estate property or estate interests;

f. any deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance instrument, title-transfer instrument, delivery, recording, acceptance, enforcement act, or related transfer by which YSA purported to transfer, convey, surrender, accept, obtain, or control any property of the Title Owner Plaintiffs or Debtor Plaintiffs is invalid, unauthorized, avoidable, void or voidable, unenforceable, and subject to cancellation, and title should be returned to Title Owner Plaintiffs;

g. YSA had no authority under the joinders, POAs, CPSAs, notes, guaranties, or other loan documents to execute, deliver, record, accept, enforce, or use any deed in lieu of foreclosure or similar instrument on behalf of the Title Owner Plaintiffs or to YSA;

h. YSA could not act simultaneously as purported attorney-in-fact for the Title Owner Plaintiffs and as transferee, beneficiary, recipient, or controlling party under any deed in lieu of foreclosure;

i. YSA's foreclosure, deed-in-lieu, title-transfer, and control acts are invalid, avoidable, or ineffective; and

j. YSA has no secured claim except to the extent of valid, unavoidable, properly perfected liens in estate property;

k. YSA violated the automatic stay by filing, prosecuting, maintaining, threatening, or refusing to dismiss the Entrata Action without first obtaining relief from the automatic stay;

l. YSA violated the automatic stay by forcibly entering properties, expelling Title Owner Plaintiffs, including Debtor Plaintiffs, from possession or operational control, changing locks, threatening trespass or arrest, using competing management personnel, and otherwise engaging in self-help takeover conduct on July 20, 2026 without first obtaining relief from the automatic stay;

m. all postpetition acts taken by YSA in connection with the Entrata Action, including filings, discovery, subpoenas, notices, demands, restraints, orders, or other relief obtained without stay relief, are void or voidable and may not be used or relied upon by YSA notwithstanding the dismissal of the Entrata Action;

n. all postpetition acts taken by YSA to obtain possession of, exercise control over, or interfere with estate property or estate-related rights through the July 20, 2026 takeover conduct are void or voidable;

o. YSA may not use any lawsuit against Entrata or any other vendor, service provider, property manager, software provider, payment processor, accounting provider, leasing platform, or data custodian to obtain possession of, exercise control over, interfere with, collect from, or affect property of the estates without first obtaining relief from this Court; and

p. YSA must withdraw, vacate, rescind, cancel, and unwind all filings, notices, demands, discovery, subpoenas, communications, asserted rights, or other acts taken in connection with the Entrata Action before its dismissal to the extent they violate or affect rights protected by the automatic stay; and

q. YSA may not use disputed mortgages, deeds in lieu, title claims, deeds, powers of attorney, joinders, foreclosure theories, law enforcement, or competing management personnel to expel Plaintiffs from possession or operational control without first obtaining relief from this Court.

## COUNT IX — CLAIM OBJECTION, CLAIM ESTIMATION, DISALLOWANCE, AND SECURED STATUS UNDER 11 U.S.C. §§ 502 AND 506

**(on behalf of the Debtor Plaintiffs only)**

219. Plaintiffs incorporate all prior allegations as though fully set forth herein.

220. YSA asserts or is expected to assert claims against Debtor Plaintiffs and their estates.

221. YSA's claims should be disallowed or reduced under 11 U.S.C. § 502(b) to the extent unenforceable, avoidable, excessive, penal, unsupported, based on invalid or unauthorized liens, mortgages, deed-in-lieu instruments, title-transfer instruments, or contrary to applicable law.

222. To the extent any note contains a savings clause purporting to reduce interest to the maximum lawful rate, YSA's asserted payoff violates its own documents and must be reduced.

223. Any asserted claim by YSA based on a deed in lieu of foreclosure, attempted deed in lieu, title-transfer instrument, foreclosure expense, title expense, recording expense, deed preparation expense, title-company expense, enforcement expense, or other amount arising from YSA's attempted transfer of Title Owner property should be disallowed because those amounts arise from unauthorized, avoidable, and inequitable conduct.

224. YSA's claims should also be disallowed, reduced, subordinated, surcharged, offset, or otherwise adjusted to account for damages, sanctions, attorneys' fees, costs, and other liabilities arising from YSA's stay violation.

225. Any asserted claim by YSA based on fees, costs, interest, default charges, indemnity, enforcement expenses, or other amounts incurred in connection with the Entrata Action should be disallowed because such amounts arise from conduct taken in violation of the automatic stay regardless of Entrata's dismissal of the Entrata Action.

226. YSA is not entitled to secured status for any claim, charge, fee, expense, or alleged collateral right arising from or enhanced by the Entrata Action or any other act taken in violation of the automatic stay.

227. YSA has no secured claim based on avoided, invalid, unauthorized, or unperfected liens, mortgages, membership-interest pledges, perfection acts, purported foreclosures upon membership interests, deeds in lieu of foreclosure, title-transfer instruments, or control rights.

228. Any allowed YSA claim should be limited to principal actually advanced, less payments received, plus only lawful, reasonable, non-penal amounts allowed by this Court.

## COUNT X — TURNOVER AND INJUNCTIVE RELIEF UNDER 11 U.S.C. §§ 542 AND 105

**(on behalf of the Debtor Plaintiffs only)**

229. Plaintiffs incorporate all prior allegations as though fully set forth herein.

230. YSA possesses, controls, or asserts control over property, rights, records, releases, proceeds, membership interests, governance rights, management rights, payoff information, title-clearing documents, deed-in-lieu instruments, deeds, conveyance instruments, recording submissions, title-transfer documents, title-company communications, escrow instructions, acceptance notices, title records, possession rights, rents, proceeds, property records, Entrata-related records, account access, service rights, data, operational rights, vendor communications, litigation demands, discovery, subpoenas, notices, claims, or other estate-related property or rights, or other estate-related property subject to turnover under 11 U.S.C. § 542.

231. Debtor Plaintiffs seek an injunction prohibiting YSA from enforcing, foreclosing, transferring, expanding, recording, asserting, or acting upon disputed or avoided liens, mortgages, deeds in lieu of foreclosure, attempted deed-in-lieu instruments, title-transfer instruments, joinders, powers of attorney, foreclosure rights, or control rights except by further order of this Court. Plaintiffs also seek an injunction prohibiting YSA from forcibly entering properties, excluding Plaintiffs from possession or operational control, changing locks, directing trespass or arrest threats, installing competing management personnel, or otherwise using self-help to take possession of or control over properties or operations without further order of this Court.

232. Debtor Plaintiffs also seek mandatory relief requiring YSA to execute releases, cancellations, withdrawals, corrective filings, satisfactions, rescissions, deed cancellations, deed-in-lieu withdrawals, title corrections, title affidavits, notices of invalidity, and documents necessary to restore estate property and clear title. Plaintiffs also seek mandatory relief requiring YSA to restore possession and operational control disturbed by the July 20, 2026 takeover conduct, reverse lock changes, cease exclusionary measures, and return access, records, keys, and control rights wrongfully taken or disturbed.

233. Debtor Plaintiffs seek an order requiring YSA to file releases in each county where any second mortgage or deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance instrument, title-transfer instrument, or related notice was recorded and to deliver written notices to all title companies, senior lenders, refinancing parties, investors, and transaction counterparties that the mortgages and any deed-in-lieu or title-transfer instruments are void, avoided, released, cancelled, rescinded, or unenforceable.

234. Debtor Plaintiffs seek mandatory relief requiring YSA to produce and turn over every deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance instrument, title-transfer document, recording submission, title-company communication, escrow instruction, delivery notice, acceptance notice, demand, affidavit, authorization, notarization, and related document concerning any Title Owner property.

235. Debtor Plaintiffs seek mandatory relief requiring YSA to withdraw, cancel, rescind, release, correct, and provide notice of invalidity for any deed in lieu of foreclosure or related title-transfer act that YSA delivered, recorded, attempted to record, asserted, accepted, enforced, or used.

236. Debtor Plaintiffs seek an injunction prohibiting YSA from taking possession of, collecting rents from, changing locks at, contacting tenants concerning ownership of, directing property managers concerning, noticing lenders about, marketing, selling, transferring, assigning, recording against, or otherwise exercising control over any property based on any deed in lieu of foreclosure or attempted deed-in-lieu transaction.

237. Debtor Plaintiffs seek an injunction prohibiting YSA from filing, prosecuting, maintaining, threatening, taking discovery in, commencing or renewing any action against Entrata or any other property-management, software, leasing, accounting, rent-collection, payment-processing, data, or operational vendor to the extent the action seeks to obtain possession of, exercise control over, interfere with, collect from, or affect property of the Debtor Plaintiffs' estates without prior relief from the automatic stay.

238. Debtor Plaintiffs seek mandatory relief requiring YSA to withdraw, vacate, rescind, cancel, and cease reliance on any relief, discovery, subpoena, notice, demand, request, communication, or other act issued, served, obtained, or made in connection with the Entrata Action before its dismissal to the extent it affects estate property or estate operations, and provide written notice to Entrata and any affected parties that no such act may be used to interfere with estate property or estate operations absent further order of this Court.

239. Debtor Plaintiffs seek an order requiring YSA to turn over or return any estate records, data, account information, proceeds, operational information, or other estate-related property obtained from Entrata or any other third party through the Entrata Action or other stay-violating conduct.

**COUNT XI — EQUITABLE SUBORDINATION, PENALTY DISALLOWANCE, AND NON-COMPENSATORY CHARGE REDUCTION**

**(on behalf of the Debtor Plaintiffs only)**

240. Plaintiffs incorporate all prior allegations as though fully set forth herein.

241. YSA engaged in inequitable conduct, including predatory lending, usury, grossly disproportionate claim inflation, coercive threats, refusal to provide payoff information, misuse of joinders and powers of attorney, purported foreclosure upon pledged membership interests, recording of second mortgages, attempting to obtain or use various instruments to transfer Title Owner property to itself or for its benefit, obstruction of transactions, and assertion of control rights based on avoidable obligations, and postpetition violation of the automatic stay through the Entrata Action, July 20, 2026 takeover, and related efforts to interfere with estate property and operations.

242. YSA's conduct injured creditors by creating debts which YSA knew that the obligors could not pay, blocking liquidity transactions that could have paid creditors, preserving YSA's leverage at the expense of the estates, and threatening senior-loan defaults that would reduce estate value, clouding or attempting to transfer real-property title, and attempting to strip creditors and estates of equity through unauthorized transfers of title.

243. YSA's conduct is more egregious than ordinary hard bargaining because it used self-help POA recordings to encumber non-borrower property and then, on information and belief, attempted to use similar self-help instruments to convey Title Owner property to itself, and force payment of a claim exponentially larger than value advanced.

244. YSA's asserted claims include penalties and non-compensatory charges, including default charges, minimum payoff amounts, compounding interest, affiliate-loan penalties, confession-of-judgment amounts, and charges bearing no reasonable relationship to actual damages or value provided.

245. YSA's stay violation injured creditors by increasing administrative expenses, disrupting estate operations, threatening impairment of critical vendor relationships, tenant relationships, and property improvements, disruptions of the flow of rent, and attempting to obtain leverage over estate property outside the supervision of this Court.

246. Any allowed YSA claim should be equitably subordinated under 11 U.S.C. § 510(c), and any lien securing a subordinated claim should be transferred to the estates.

## COUNT XII — CONVERSION

**(on behalf of all Plaintiffs)**

247. Plaintiffs incorporate all prior allegations as though fully set forth herein.

248. This Count is asserted by all Plaintiffs to the extent each Plaintiff suffered a direct injury from YSA's wrongful exercise of dominion and control over that Plaintiff's personal property, identifiable funds, possession rights, management-related property, records, accounts, rents, software access, keys, locks, access credentials, communications, and other personal or intangible property interests recognized under applicable nonbankruptcy law.

249. Plaintiffs owned, possessed, controlled, or had the immediate right to possess or control property and property-related interests that YSA wrongfully took, excluded, withheld, controlled, redirected, impaired, or appropriated.

250. That property and those property-related interests include, without limitation and as applicable to particular Plaintiffs: keys; locks; office access; access credentials; management software credentials; records; books and records; leasing files; tenant files; rent rolls; tenant communications; vendor communications; bank account access; rent streams; accounts; proceeds; data; equipment; offices; operational systems; management rights reduced to possession and control; and other identifiable personal property or property-related interests.

251. YSA intentionally and wrongfully exercised dominion and control over that property and those interests by, among other things, recording and asserting unauthorized liens and title instruments, claiming purported deed-in-lieu and control rights, directing competing management personnel, taking or attempting to take possession of management offices, changing or attempting to change locks, excluding or attempting to exclude Vesta Realty personnel and Plaintiffs from possession or operational control, redirecting or attempting to redirect operational control, and otherwise interfering with Plaintiffs' possession and control.

252. YSA's exercise of dominion and control was unauthorized, wrongful, and inconsistent with Plaintiffs' rights.

253. To the extent YSA contends it acted under deeds, deeds in lieu of foreclosure, mortgages, powers of attorney, joinders, title claims, or other instruments, those documents did not authorize YSA's dominion and control over the converted property or property-related interests, and in any event were disputed, avoidable, invalid, unauthorized, unenforceable, or used beyond their lawful scope.

254. YSA's conduct deprived Plaintiffs of possession, use, control, access, revenues, records, and operational benefits associated with their property and property-related interests.

255. As a direct and proximate result of YSA's conversion, Plaintiffs have suffered damages, including loss of possession, loss of use, loss of control, lost revenues, restoration costs, operational damages, property-management disruption, costs to recover control or access, attorneys' fees to the extent permitted by applicable law, and other actual damages in amounts to be proven at trial.

256. Plaintiffs are entitled to recover actual damages, exemplary or punitive damages to the extent permitted by applicable law, prejudgment and postjudgment interest, costs, restitution, return of converted property, and such other relief as the Court deems proper.

**COUNT XIII — UNJUST ENRICHMENT/RESTITUTION**

**(on behalf of all Plaintiffs)**

257. Plaintiffs incorporate all prior allegations as though fully set forth herein.

258. This Count is asserted by all Plaintiffs to the extent YSA obtained benefits at Plaintiffs' expense under circumstances that make it unjust for YSA to retain those benefits.

259. By reason of the conduct alleged in this Complaint, YSA obtained or attempted to obtain valuable benefits, including without limitation asserted liens, title leverage, possession leverage, management-control leverage, operational control, access to offices and systems, asserted rights to rents or revenues, negotiating leverage over Plaintiffs and their creditors, and other benefits derived from disputed and wrongful assertions of ownership, lien, deed-in-lieu, possession, foreclosure, or control rights.

260. YSA also obtained or attempted to obtain benefits from the use of Plaintiffs' property, records, personnel displacement, operational systems, rents, revenue streams, data, vendor and tenant relationships, and other assets or advantages belonging to or associated with Plaintiffs.

261. Any such benefits were obtained through inequitable, wrongful, avoidable, unauthorized, coercive, and/or stay-violating conduct, including the recording of disputed instruments, assertion of disputed title and control rights, self-help possession efforts, use of competing management personnel, interference with property operations, and other conduct alleged herein.

262. It would be unjust and inequitable for YSA to retain any such benefits without compensating Plaintiffs or restoring the benefits, value, revenues, rights, access, and property of which Plaintiffs were deprived.

263. Plaintiffs have no adequate remedy at law for all of the benefits YSA has obtained or attempted to obtain, and plead unjust enrichment in the alternative to the extent required by applicable law.

264. Plaintiffs are entitled to restitution, disgorgement, imposition of an equitable remedy requiring return of wrongfully obtained benefits, monies, revenues, access, control, and value, and such other equitable or monetary relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Debtor Plaintiffs and/or Non-Debtor Plaintiffs, as applicable, request judgment against YSA as follows:

a. avoiding the transfers and obligations described herein under 11 U.S.C. § 548(a)(1)(B);

b. avoiding the transfers and obligations described herein under 11 U.S.C. § 548(a)(1)(A);

c. avoiding the transfers and obligations described herein under 11 U.S.C. § 544(b), the Delaware Uniform Fraudulent Transfer Act, the Texas Uniform Fraudulent Transfer Act, the Oklahoma Uniform Fraudulent Transfer Act, and other applicable law;

d. avoiding YSA's liens, mortgages, security interests, membership-interest pledges, perfection acts, UCC-1's, purported foreclosures upon membership interests, assignments, deeds in lieu of foreclosure, attempted deed-in-lieu transfers, deeds, conveyance instruments, title-transfer instruments, foreclosure transfers, control transfers, and related interests under 11 U.S.C. § 544(a);

e. avoiding preferential transfers under 11 U.S.C. § 547;

f. recovering avoided transfers or their value under 11 U.S.C. § 550;

g. preserving avoided transfers, liens, mortgages, security interests, membership-interest pledges, perfection acts, foreclosures upon membership interests, deeds in

lieu of foreclosure, deeds, conveyance instruments, title-transfer instruments, and related interests for the benefit of the estates under 11 U.S.C. § 551;

h. declaring that the joinders did not grant YSA real property mortgages and are avoidable obligations to the extent YSA uses them to impose obligations or liens unsupported by reasonably equivalent value;

i. declaring that YSA's powers of attorney did not create unavoidable real property lien rights and are avoidable or unenforceable to the extent used to create obligations or transfers unsupported by reasonably equivalent value;

j. declaring that YSA's powers of attorney did not authorize any deed in lieu of foreclosure, deed, conveyance instrument, title-transfer instrument, self-dealing transfer, transfer to YSA, transfer to YSA's designee, waiver of foreclosure protections, waiver of redemption rights, surrender of title, transfer of fee ownership, or transfer of Title Owner property;

k. declaring that any deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance instrument, title-transfer document, delivery, recording, acceptance, enforcement act, or related transfer by which YSA purported to transfer, convey, surrender, assign, accept, obtain, or control any property of the Title Owner Plaintiffs or Debtor Plaintiffs is invalid, unauthorized, avoidable, void or voidable, unenforceable, and subject to cancellation, rescission, turnover, and release;

l. declaring that YSA cannot act simultaneously as purported attorney-in-fact or agent for any Title Owner and as transferee, beneficiary, recipient, or controlling party under any deed in lieu of foreclosure, attempted deed in lieu, conveyance instrument, or title-transfer instrument;

m. declaring the validity, extent, priority, and enforceability of YSA's claims, liens, mortgages, security interests, deeds in lieu of foreclosure, attempted deed-in-lieu transfers, deeds, conveyance instruments, title-transfer instruments, foreclosure rights, and control rights;

n. declaring that YSA violated the automatic stay under 11 U.S.C. § 362(a) by filing, prosecuting, maintaining, threatening, or refusing to dismiss the Entrata Action without relief from the automatic stay before Entrata dismissed the Entrata Action on July 20, 2026;

o. declaring that YSA violated the automatic stay under 11 U.S.C. § 362(a) by forcibly entering properties, expelling Title Owner Plaintiffs, including debtor Plaintiffs, from possession or operational control, changing locks, threatening trespass or arrest, using competing management personnel, and otherwise engaging in self-help takeover conduct on July 20, 2026 without first obtaining relief from the automatic stay;

p. declaring that all postpetition acts taken by YSA in connection with the Entrata Action, including filings, requests for relief, orders, discovery, subpoenas, notices, demands, claims, restraints, or other acts affecting estate property or estate operations, are void or voidable and may not be used or relied upon by YSA notwithstanding the dismissal of the Entrata Action;

q. declaring that all postpetition acts taken by YSA in connection with the July 20, 2026 self-help takeover conduct are void or voidable;

r. ordering YSA to withdraw, vacate, rescind, cancel, cease reliance on, and unwind all filings, notices, subpoenas, discovery, demands, orders, communications, asserted rights, or other relief issued, served, obtained, or pursued in connection with the Entrata Action before its dismissal to the extent they affect estate property, estate rights, estate operations, or estate service relationships;

s. ordering YSA to provide written notice to Entrata and all affected vendors, title companies, senior lenders, investors, transaction counterparties, service providers, and other affected parties that YSA's postpetition actions were taken without stay relief and may not be used to interfere with estate property or estate operations notwithstanding the dismissal of the Entrata Action;

t. enjoining YSA from commencing, prosecuting, maintaining, threatening, or taking discovery in any action against Entrata or any other property-management, software, leasing, accounting, rent-collection, payment-processing, data, or operational vendor to the extent such action seeks to obtain possession of, exercise control over, interfere with, collect from, or affect property of the Debtor Plaintiffs' estates without prior relief from the automatic stay;

u. ordering YSA to unwind, vacate, rescind, cancel, and remediate all acts taken in connection with the July 20, 2026 self-help takeover conduct, including restoring possession and operational control, reversing lock changes, ceasing exclusionary measures, and returning access, records, keys, and other control rights wrongfully taken or disturbed;

v. enjoining YSA from using disputed mortgages, deeds in lieu, title claims, deeds, powers of attorney, joinders, foreclosure theories, law enforcement, competing management personnel, or any other self-help measures to expel Plaintiffs from possession or operational control or otherwise take possession of or exercise control over estate property or estate-related rights without prior relief from the automatic stay;

w. declaring that any postpetition deed-in-lieu conduct affecting estate property, including any delivery, execution, recording, acceptance, enforcement, notice, demand, title-transfer act, possession-transfer act, rent-transfer act, or control act, violated the automatic stay and is void or voidable;

x. ordering YSA to cancel, release, rescind, withdraw, correct, and provide notice of invalidity for any deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance instrument, title-transfer instrument, recording, delivery, acceptance, enforcement act, or related transfer affecting any Title Owner property;

y. ordering YSA to produce and turn over every deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance instrument, title-transfer document, recording

submission, title-company communication, escrow instruction, delivery notice, acceptance notice, demand, affidavit, authorization, notarization, and related document concerning any Title Owner property;

z. ordering YSA to return and turn over any title, possession, rents, proceeds, records, rights, value, or property obtained, asserted, controlled, or purportedly transferred through any deed in lieu of foreclosure or attempted deed-in-lieu transaction;

aa. enjoining YSA from recording, re-recording, delivering, asserting, enforcing, accepting, transferring, assigning, noticing, relying upon, or using any deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance instrument, title-transfer instrument, or similar document concerning any Title Owner property except by further order of this Court;

bb. enjoining YSA from taking possession of, collecting rents from, changing locks at, contacting tenants concerning ownership of, directing property managers concerning, noticing lenders about, marketing, selling, transferring, assigning, recording against, or otherwise exercising control over any property based on any deed in lieu of foreclosure or attempted deed-in-lieu transaction;

cc. awarding compensatory sanctions and punitive damages for YSA's stay violation, including attorneys' fees, costs, expenses, operational damages, and other damages caused by the Entrata Action, July 20, 2026 takeover, and related stay-violating conduct;

dd. awarding civil-contempt sanctions under 11 U.S.C. §§ 105(a) and 362, including coercive sanctions if YSA fails to withdraw, vacate, rescind, cancel, unwind, cease reliance on, and remediate all stay-violating conduct related to the Entrata Action;

ee. disallowing, reducing, offsetting, subordinating, or otherwise adjusting any YSA claim to account for damages, sanctions, attorneys' fees, costs, and liabilities arising from YSA's stay violation;

ff. disallowing any YSA claim for fees, costs, interest, default charges, indemnity, or enforcement expenses incurred in connection with the Entrata Action or any other act taken in violation of the automatic stay;

gg. disallowing any YSA claim for fees, costs, interest, default charges, indemnity, title expenses, recording expenses, deed-preparation expenses, enforcement expenses, or other amounts incurred in connection with any deed in lieu of foreclosure, attempted deed in lieu, deed, conveyance instrument, title-transfer instrument, or other unauthorized title-transfer conduct;

hh. disallowing, reducing, or estimating YSA's claims under 11 U.S.C. § 502;

ii. determining YSA's secured status under 11 U.S.C. § 506;

jj. ordering turnover under 11 U.S.C. § 542;

kk. preliminarily and permanently enjoining YSA from enforcing, foreclosing, expanding, transferring, assigning, recording, or otherwise acting upon disputed or avoided claims, liens, mortgages, deeds in lieu of foreclosure, attempted deed-in-lieu instruments, title-transfer instruments, joinders, POA rights, foreclosure rights, or control rights or from using the Entrata Action or any similar action against third-party vendors or service providers to obtain possession of, exercise control over, interfere with, collect from, or affect estate property except by order of this Court or from forcibly entering properties, excluding Plaintiffs from possession or operational control, changing locks, directing trespass or arrest threats, installing competing management personnel, or otherwise engaging in self-help takeover conduct;

ll. requiring YSA to execute and record releases, cancellations, withdrawals, satisfactions, corrective filings, rescissions, deed cancellations, deed-in-lieu withdrawals, title corrections, title affidavits, notices of invalidity, and related documents necessary to clear title and restore estate rights;

mm. requiring YSA to provide written notices to affected title companies, senior lenders, refinancing parties, investors, transaction counterparties, Entrata, property-management vendors, software vendors, payment processors, leasing platforms, accounting providers, data custodians, county recorders, escrow agents, title insurers, property managers, tenants if necessary, and any person or entity that received any deed-in-lieu notice, recording, demand, or title-transfer communication, and other operational service providers and to any law-enforcement agencies, competing management personnel, or other persons to whom YSA communicated its purported authority to take possession or control on July 20, 2026;

nn. equitably subordinating any allowed YSA claim under 11 U.S.C. § 510(c);

oo. transferring any lien securing a subordinated YSA claim to the estates;

pp. disallowing, avoiding, reducing, or recharacterizing penalties non-compensatory charges, deed-in-lieu charges, title-transfer expenses, recording expenses, title expenses, and related charges;

qq. awarding all Plaintiffs actual damages for YSA's conversion of personal property, identifiable funds, possession-related property, access credentials, records, rents, accounts, data, operational systems, and other property or property-related interests;

rr. ordering YSA to return, restore, or account for all converted property, including keys, locks, access credentials, records, files, data, rent information, account information, software access, office access, and other property or property-related interests wrongfully taken, withheld, controlled, or impaired;

ss. awarding all Plaintiffs exemplary or punitive damages on the conversion claim to the extent permitted by applicable law;

tt. awarding restitution, disgorgement, and unjust-enrichment relief to all Plaintiffs for all benefits, revenues, leverage, control, access, and value YSA obtained or attempted to obtain at Plaintiffs' expense;

uu. ordering YSA to disgorge and restore any rents, revenues, proceeds, benefits, access, management-control benefits, title leverage, possession leverage, or other value wrongfully obtained or retained through the conduct alleged herein;

vv. awarding pre-judgment and post-judgment interest;

ww. awarding attorneys' fees, costs, and expenses to the extent permitted;

xx. retaining jurisdiction to enforce the Court's orders and judgment; and

yy. granting such other and further relief as the Court deems just and proper.

Dated: July 21, 2026

By: /s/ *Joyce W. Lindauer*

Joyce W. Lindauer
State Bar No. 21555700
Lindauer & Vaughn
117 S. Dallas Street
Ennis, TX 75119
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
joyce@joycelindauer.com

*Proposed Attorneys for Debtor Plaintiffs*

-and-

Leib M. Lerner, CA Bar No. 227323
*Pro Hac Vice to be filed*
Douglas J. Harris, CA Bar No. 329946
*Pro Hac Vice to be filed*
LERNER HARRIS LAW
9350 Wilshire Blvd., Suite 203
Beverly Hills, CA 90212
Telephone: (310) 742-5590
leib.lerner@lernerharris.com
douglas.harris@lernerharris.com

*Proposed Special Counsel for Louis Investments, LLC and Attorneys for Non-Debtor Plaintiffs*